**TRUSCON STEEL CO. v. COOKE.**

No. 1631.

Circuit Court of Appeals, Tenth Circuit.

Sept. 7, 1938.

Rehearing Denied Oct. 13, 1938.

Frank Wells, of Oklahoma City, Okl., and A. C. Ruihley, of Youngstown, Ohio (D. I. Johnston, of Oklahoma City, Okl., on the brief), for appellant.

Paul G. Darrough, of Oklahoma City, Okl. (Bland West, of Oklahoma City, Okl., on the brief), for appellee.

Before PHILLIPS, BRATTON, and WILLIAMS, Circuit Judges.

WILLIAMS, Circuit Judge.

On June 27, 1936, W. Cooke, as plaintiff, having commenced this suit in the district court of Oklahoma County, Oklahoma, against the Truscon Steel Company as defendant, to recover damages for an alleged breach of contract, it was there-

after duly removed by the Steel Company to the United States District Court for the Western District of Oklahoma.

The parties will hereafter be referred to respectively as "Cooke" and the "Steel Company."

The cause was tried to a jury, a verdict being returned for $7,343.75 against the Steel Company. Judgment having been entered for such amount, with interest at 6 per cent. per annum from August 1, 1933, this appeal followed.

At close of introduction of all the evidence the Steel Company moved for a directed verdict in its favor which was overruled. Exceptions were saved, not only thereto but also to other actions of the court, each of which are here assigned as error.

Cooke, a general building contractor, was awarded a contract by the United States Government to construct an auditorium and gymnasium at the Tahlequah Training School. Shortly prior to such award, Naylor, state agent for the Steel Company, having gotten in touch with Cooke, they reviewed the specifications covering the structural steel, trusses, and miscellaneous iron required in such construction. Thereafter Naylor submitted to Cooke two copies identified as Exhibit A, which were signed "Truscon Steel Company by L. D. Naylor," each of which is as follows:

"Quotation

"Agency Oklahoma City, Oklahoma
"Date November 23rd 1932
"Quotation to Wm. Cooke    Address Elks Building, Shawnee, Oklahoma,

"We propose to furnish the following described materials required for Auditorium and Gymnasium, Sequoyah Training School, Tahlequah, Oklahoma, in accordance with the following terms and conditions, including those printed on the reverse side of this sheet, which upon acceptance by you of this proposal are agreed to and accepted by you:

(Then follows list of materials to be furnished for $4,950.00.)

\*    \*    \*    \*    \*    \*

"Prompt acceptance of this quotation by you and the written approval of our Home Office shall constitute a binding contract."

Both copies of said Exhibit A were signed by Cooke, one retained by him and the other by Naylor.

On December 3, 1932, Cooke wrote to the Department of Interior giving a list of subcontractors on such job, listing the Steel Company as one, to be approved for the furnishing of steel, iron, and hardware to be used in construction of said buildings. The government approved the Steel Company as a subcontractor. Cooke being required by the government to begin work on November 28, 1932, he advised Naylor that he would need the reinforcing steel about four days after said date, who told him that he would get it locally, and secured same from the Sand Springs Steel Company, Tulsa, Oklahoma. Naylor also told Cooke to mail his plans to the head office at Youngstown, Ohio, so that shop drawings could be made and mailed to United States Department of the Interior at Washington, D. C., for approval.

On January 7, 1933, Naylor wrote a letter signed "Truscon Steel Company by L. D. Naylor, Branch Manager," to Cooke.[1]

The contract (January 7th) in duplicate referred to therein by Naylor for Cooke's signature was a revision of the first quotation of November 23, 1932, and contained the following: "Prompt acceptance of this quotation by you and the written approval of our Home Office shall constitute a binding contract."

Neither the "quotation" of November 23, 1932, nor that of January 7, 1933, ever received "written approval of the Home Office."

On January 21, 1933, the Washington, D. C., office of the Steel Company having

---

[1] "\*   \*   \*   I am also attaching for your signature contracts in duplicate covering the materials which we do not manufacture. We have made arrangements with Mr. Bissell to furnish the Toilet Partitions and the tin clad door as per attached contracts. We have also made arrangements with the Oklahoma Wire and Iron Works to furnish you the miscellaneous items as per their attached contracts, and are enclosing also a new contract form of ours for your signature with these items omitted, as our Home Office desires that these items be omitted due to the fact that we would have to add an item of not less than ten per cent for overhead to same and in which event would make the balance of our materials just that much cheaper. \*   \*   \*"

submitted drawings to the Department of the Interior, and same having been approved by said department, were sent to Cooke, stamped thereon as follows: "The issuance of this drawing for approval does not constitute acceptance of the contract by the Truscon Steel Company."

On January 28, 1933, Naylor, from Oklahoma City, Oklahoma, wrote the Metal Lath Department, c/o Cooke, Tahlequah, Oklahoma.[2]

On the same date (January 28, 1933), Naylor wrote Cooke that the home office requested that he secure his latest financial statement, in which he further stated:

"Also, if it is at all possible for you to do so, it would certainly help matters if you could send in a check for around $500.00 to apply on your old account, or else write Mr. McGuire when you will be able to send him at least a substantial payment."

Cooke had previously transacted business with the Steel Company through Naylor on another job which was completed in the early part of 1932, and was due Steel Company a balance on the account arising therefrom in the sum of $1,232.59. On February 5, 1933 (date as corrected), Cooke wrote the Steel Company at Youngstown, Ohio.[3]

On February 16, 1933, the credit man replied to Cooke.[4]

On February 21, 1933, Cooke wrote in

---

[2] "Subject: OC 2494, Wm. Cooke, Contractor, Auditorium and Gymnasium, Sequoyah Training School, Tahlequah, Oklahoma.

"To: Metal Lath Department, c/c Mr. Wm. Cooke, Γ O. Box 573, Tahlequah, Oklahoma. c/c/ Washington Office.

"* * * Included in the above contract is the necessary metal lath for floors and ceilings. In addition to these items, there will be required some corner bead and base screed.

"We are just in receipt of a letter from Mr. Cooke the General Contractor on this job, advising that approval of these materials are to be obtained at the job site, so would appreciate your having sent to Mr. Wm. Cooke, P. O. Box 573, Tahlequah, Oklahoma, two samples each of the following:

4# ⅜" Rib Lath (Painted)
3.4# ⅜" Rib Lath (Painted)
2.5# Small Mesh Diamond Lath (Painted)
¾# C. R. Channels
1½" C. R. Channels
Straight Base Screed
Curve Point Base Screed
Rib Steel Corner Bead
Expanded Type Corner Bead.

"Please arrange to get these samples off to Mr. Cooke immediately so that we can order same placed in the car with his other materials which will be coming forward very soon, enabling us to quote this customer carload prices on the balance of his requirements not covered by our original contract.
"(Signed)
Truscon Steel Company,
By L. D. Naylor.
"Washington Office: Please note Mr. Cooke is to obtain approval on these items at Tahlequah, so there will be no need of your submitting same."

[3] "Mr. L. D. Naylor, of your Oklahoma City office suggested that you might like to see a statement of my financial condition, so I am enclosing a condensed balance sheet as of Jan. 31, 1933. I think there is only one item that requires an explanation; the account receivable of $7,495.00 is the amount due on the Tahlequah Gymnasium job for the month of Jan. As you are probably aware, I may not receive this exact amount as the Dept. of Interior sometimes alters the figures to suit themselves. However, if I receive substantially this amount, which I expect to do, I shall be glad to send you a check at a very early date to apply on my old balance."

[4] "This will acknowledge that your 2-5-33 letter to which was attached a statement as of 1-31-33.

"You indicated that $7495.00 was the amount due you on the January estimate, the Tahlequah Gymnasium job.

"You also indicated when this was received you would forward check for your old balance on the (Shawnee) Infirmary job of $1232.59. This remittance has not reached us to date. The writer just reviewed accounts with the auditors preparing the annual statement of this company's affairs as well as company officers and has been accused of everything but looting the company treasury in waiting to this date for the old balance above referred to. In fact I was instructed to proceed immediately with drastic action to collect this account. Unless receiving your remittance within the next 7 days it will be necessary to hand the account to the bondsmen and take over proper steps to fully protect this account. I can frankly say we do not have another customer on our ledger who has been extended the courtesy you have, and we must insist on your immediate compliance with the above request."

reply to the credit man of the Steel Company.[5]

On February 22, 1933, the credit man again wrote Cooke.[6]

On March 3, 1933, Cooke remitted the balance due on the old account.

On March 16, 1933, the Credit Manager of the Steel Company from Youngstown, Ohio, wired Naylor to advise Cooke that the Steel Company did not accept the contract, and on March 20, 1933, so wired Cooke.[7] On March 22, 1933, Naylor wrote Cooke that he was shocked and surprised to learn that the Steel Company had refused to accept the contract as he felt sure that it would after the old balance was paid; that after he learned of the refusal, he had immediately contacted Capitol Steel & Iron Company to see if it would take over the contract on the same terms and it had agreed to do so. At that time Cooke had about 20 days in which to finish the building without being penalized. He obtained the steel to finish the building from Capitol Steel & Iron Com-

[5] "I have your letter of the 16th, in reference to Cooke & Maxey account. I know all that you say is correct. The *iten* or monthly estimate *taht* was due me on Feb. 1st (7495.00) I *di* not get till about the 14th. This was on account of the Clerk being out of town, but I did get that amount at about the 14th.

"In my letter which I enclosed $400.00 which I paid out of this estimate left me about $7,000.00 with this money I had to pay my last months bills and still have enough to pay the labor for this month. I thought I was doing great. I figured I was getting along fine with the bills that *Coke &* Maxey owed. I have taken it upon myself to pay them all, and yours happened to be the last one. I explained to Mr. Naylor how things was with me since Maxeys death, and he could see that I was O. K. if given a chance. All I will have to do if you do as you say is just to quit business, and then I will not be able to pay anything as I would have to work for someone else. But who should I work for if there is nothing to do.

"You have been very good to me up to now, and just when I am about able to pay you in full you step on me hard. You make it impossible. I have at this time got the job stopped, I am waiting for steel for which your company has the contract, I did as your Mr. Naylor asked, I paid $400.00 and still I get no material. I am under a penalty of $70.00 a day and if your company insists in doing as your letter states, and not give me a chance then I am through. I have got a fairly good job here, and I sure am done if I do not get a further extension of credit from you on the Maxey account, as I figured to pay you in full upon completion *fo* this job, which I have to complete in about 2 months. but if I cannot get the material from you until the balance of the Cooke & Maxey account is paid Then I am through right now, I am not to blame for this state of affairs no more than lots of other people are who have gone broke, I am not broke, I am in good shape and able to pay my bills if given a chance.

"I have thought all along that that was what was happening. I was being held up for material on account of the Cooke & Maxey account, Although Your Mr. Naylor promised that such a thing would not occur. I gave the contract for this job at Tahlequah to him because of the *leiniency* that I had *recieved* from his company. I really did *nto* think this would happen, I have got enough in this job to pay you the old balance and have enough to continue in business, if you allow me to complete it. If you will not I will have to quit right now."

[6] "Please accept our thanks for your check of $400.00 which reduces Cooke & Maxey's balance to subject amount of $832.59.

"We note in the last paragraph of your letter you request us to prepare for the shipping of the steel on the above contract pending.

"I feel sure you will readily agree with me that there is no possibility of my going to company officers for permission to engage in shipping of materials valued in excess of $4,000.00 until this old balance for 1931 and early 1932 is disposed of.

"If you will be good enough to forward your additional check of $832.59 promptly, I will be in a position to take the matter of shipping the new material on the Tahlequah job *up with company officers for approval.* Until your remittance is received it is impossible for me to do this.

"Please let this matter have your immediate attention as above requested." (Italics supplied)

[7] "Wired Mr. Naylor sixteenth to advise you immediately we could not accept order for steel auditorium and gymnasium Sequoyah Training School Tahlequah Oklahoma and wrote you same date Shawnee Oklahoma enclosing copy our wire to Naylor sorry we cannot accept this contract."

pany, the steel joists being in 20 feet lengths instead of 60 feet as called for by the specifications, such joists having to be bolted and welded together, causing expense and delay. Cooke testified that the erection of such trusses ordinarily would have required 4 days but that it actually took them from April 28, 1933, to July 1, 1933, to erect them. On June 13, 1933, Waggoner, Superintendent of Construction for Cooke, wrote Capitol Steel & Iron Company that its Mr. Thiebaud arrived on June 9 and after bolting the trusses, a test was had making a satisfactory showing. Cooke added a postscript to the letter that Thiebaud's services had been satisfactory. Thereafter, the Bonding Company for Cooke, with his approval, compromised the bill with Capitol Steel & Iron Company for $800.00 less than the billed price for the steel furnished, Cooke stating that this $800 reduction was due to expense incurred by him for labor in welding and bolting the 20 feet trusses.

For the purpose of showing that Naylor had authority to make contracts for the Steel Company and that home office approval was not essential, John Byrd, president of the Mid-West Steel Company of Oklahoma City, testified that his company had transacted business, no amount being stated, with the Steel Company through Naylor on many occasions and that he did not recall any such approval by the Home Office. In refutation, Harry Smith, the present branch manager of the Steel Company for Oklahoma, testified that the Home Office had sent out approvals on all long form contracts involving more than $300, and that copies of letters of such approval were in the Steel Company's files on all orders from Mid-West involving more than $300.

Cooke's contention in court below was that Steel Company had become liable by the execution of the proposals of November 23, 1932, and January 7, 1933, and on account of its acts and conduct in recognition of and in entering upon performance of the contract.

The contention of the Steel Company is that no binding contract was ever entered into with Cooke.

■ The power of any agent to bind his principal rests upon authority conferred. Such authority as to third persons includes that incidental to or implied from the main power conferred, and that which custom and usage have added, and that which the principal has occasioned as by a previous course of dealing, causing persons dealing with the agent to reasonably believe the principal has conferred, the exercise of which by the agent, the principal is by his conduct estopped to deny, or which he has subsequently approved and ratified. The principal, however, will not be bound by an act of the agent in excess of the authority conferred where the third person has knowledge of such limitation. Gannaway v. Standard Acc. Ins. Co., 10 Cir., 85 F.2d 144; Howard v. Barnstable County Nat. Bank of Hyannis, 291 Mass. 131, 197 N.E. 40; and 2 C.J. pp. 560, 569.

■ Naylor as state representative of Steel Company, having authority to bind in all things except where a limitation was made of which such third persons were advised, such a limitation was imposed on Naylor's authority to enter into a binding contract with Cooke for the steel on the Tahlequah Gymnasium and Auditorium. "Quotation" of November 23, 1932, and that of January 7, 1933, contains the following limitation: "Prompt acceptance of this quotation by you and the written approval of our Home Office shall constitute a binding contract." Cooke signed each of these "quotations", containing such limitation, becoming in writing a party thereto, and was at all times thereafter aware of the requirement that such Home Office approval was necessary. Under this binding limitation, a contract was never consummated.[8]

■ Naylor had authority to submit these "quotations" to Cooke as a part of his preliminary work to secure the business.

8 Consolidated Fuel Co. v. Gunn, 89 Okl. 73, 213 P. 750, 751; Bolene Refining Co. v. Zobisch Oil Co., 98 Okl. 202, 224 P. 942; Clem Oil Co. v. Oliver et al., 106 Okl. 22, 232 P. 942; J. L. Owens Co. v. Vern C. Bemis, 22 N.D. 159, 133 N.W. 59, 37 L.R.A.,N.S., 232, 233, 234; Julius Kessler & Co. v. Askin, 135 Md. 647, 109 A. 439, 440; Diamond Mill Co. v. Adams-Childers Co., Tex.Civ.App., 217 S.W. 176, 178, 179; Haynes-Henson Shoe Co. v. Brown & Brown, 24 Ga. App. 765, 102 S.E. 185, 186; Bauman v. McManus, 75 Kan. 106, 89 P. 15, 10 L. R.A.,N.S., 1138; Federal Land Bank of New Orleans v. Bridgeforth, 233 Ala. 679, 173 So. 66, 73; Ingalls Steel Products Co. v. Foster & Creighton Co., 226 Ala. 122, 145 So. 464, 466; 13 C.J. 288, Section 96.

After consulting with Cooke, he drew up the "quotation" of November 23, 1932, which set forth a price quotation for the steel listed thereon. On account of limitation expressed thereon, the quotation constituted nothing more than an invitation to Cooke to make in writing an offer to the Home Office of the Steel Company to purchase such materials at the quoted price.

In Consolidated Fuel Co. v. Gunn, 89 Okl. 73, 213 P. 750, 751, the Oklahoma Supreme Court said: "The reason the order did not constitute a contract until approved is that it lacked the essential element to constitute a contract of mutual assent; such an order until approved amounted to no more than an offer or proposal on the part of the plaintiff to the defendant."

At least until such *"quotation"* was approved and accepted in writing by the Home Office of the Steel Company, such offer could have been withdrawn by Cooke.

The "quotation" of January 7, 1933, upon mere acceptance by Cooke not being a binding contract, constituted nothing more than a revision as to "quotation" of November 23, 1932. After Cooke signed same, it became Cooke's offer to purchase the materials listed therein at the price quoted, "prompt acceptance of this quotation * * *" and "written approval of * * Home Office" to "constitute a binding contract." The trial court took the view that Naylor did not have the authority to bind the Steel Company by his acts of November 23, 1932, and January 7, 1933, in executing the proposals, liability depending upon acceptance and approval in writing by the Home Office or upon ratification of Naylor's acts in executing such writings, under peculiar circumstances of the case, it being under the duty to approve or disapprove said proposals within a reasonable time, and the jury was so instructed.

The rule is that if acceptance is not made within a reasonable time, the offer expires, and such thereafter made is unavailing, and not being accepted within such reasonable time, it is not inferred. Williston on Contracts, Rev.Ed., Vol. 1, p. 153. Under certain circumstances the offeree may authorize or cause the offeror to regard silence as an acceptance of his offer, such as by conduct in past dealings. Williston on Contracts, Rev.Ed., Vol. 1, page 288, says: "A further extension of this doctrine is developing in the cases— that, where an offeree solicits the offer, this, in the light of the relations of the parties or other surrounding circumstances, may justify the offeror as a reasonable man in interpreting the offeree's silence after receiving the offer as acceptance."

The Interior Department at Washington at instance of Cooke, after his letter of December 3, 1932, approved the Steel Company as a subcontractor, but the Steel Company was not thereafter silent. The modified proposal dated January 7, 1933, was received by the Home Office on January 11, 1933, at Youngstown, Ohio. On January 28, 1933, Naylor wrote Cooke that the Home Office had requested him to secure a financial statement. On February 5, 1933, Cooke sent the Home Office the requested financial statement as of date of January 31, 1933. On February 21, 1933, Cooke wrote Steel Company, acknowledging receipt of its letter of February 16, 1933, in regard to his (Cooke and Maxey's) old account in which he states that he had thought all along that the material was being held up on account of the old unpaid balance, an admission then by Cooke of knowledge that the Home Office had not accepted and approved in writing such quotation. On February 22, 1933, the credit man of the Steel Company wrote Cooke, "in re: Cooke & Maxey account, Balance $832.59 OC 24294—$4013.50 pending," expressing thanks for receipt of a check for $400.00 which reduces Cooke & Maxey's balance to said subject amount of $832.59, further stating:

"We note in the last paragraph of your letter you request us to prepare for the shipping of the steel on the above contract pending.

"I feel sure you will readily agree with me that there is no possibility of my going to company officers for permission to engage in shipping of materials valued in excess of $4,000.00 until this old balance for 1931 and early 1932 is disposed of.

"If you will be good enough to forward your additional check of $832.59 promptly, I will be in a position to take the matter of shipping the new material on the Tahlequah job up *with company officers for approval.* Until your remittance is received it is impossible for me to do this." (Italics supplied.)

Appellee relies upon the following authorities: Laredo National Bank v. Gordon, 5 Cir., 61 F.2d 906; Cole-McIntyre-Norfleet Co. v. Holloway, 141 Tenn. 679, 214 S.W. 817, 7 A.L.R. 1683; Sioux Falls

Adjustment Co. v. Penn Soo Oil Co., 53 S.D. 77, 220 N.W. 146; Hendrickson v. International Harvester Co., 100 Vt. 161, 135 A. 702; Hobbs v. Massasoit Whip Co., 158 Mass. 194, 33 N.E. 495.

In Laredo Nat. Bank v. Gordon, supra, it is said (page 907): "It is true that, generally speaking, an offeree has a right to make no reply to offers, and hence that his silence is not to be construed as an acceptance. But, where the relation between the parties is such that the offeror is justified in expecting a reply, or the offeree is under a duty to reply, the latter's silence will be regarded as acceptance. Under such circumstances, 'one who keeps silent, knowing that his silence will be misinterpreted, should not be allowed to deny the natural interpretation of his conduct,' etc. Williston on Contracts, §§ 91, 91a."

With the assumption, without such determination, that knowledge gained by Naylor as to the contents of the contract between Cooke and the United States as to the construction of an auditorium and gymnasium at the Tahlequah Training School for Indians and the time limit contained therein for completion thereof, is imputed to the *officer at the Home Office* of the Steel Company empowered to accept such quotation, there is not under this record an implied acceptance on account of silence. Cooke during all this time was cognizant that investigation was being made as to his financial status, and this offer to purchase under the *"quotation"* held for investigation. He also knew that the time limit for completion was running and should have known that he had option and power to withdraw his offer for such purchase and to seek another offeree from whom to purchase.

On February 5, 1933, when he sent the condensed balance sheet as of January 31, 1933, he explained the "account receivable of $7,495.00" as the amount due on the Tahlequah Auditorium and Gymnasium job for the month of January, 1933, with the statement: "As you are probably aware, I may not receive this exact amount as the Dept. of Interior sometimes alters the figures * * *. However, if I receive substantially this amount, which I expect to do, I shall be glad to send you a check at a very early date to apply on my old balance."

On February 16, 1933, the credit man for the Steel Company in his letter to Cooke said:

"You indicated that $7495.00 was the amount due you on the January estimate, the Tahlequah Gymnasium job.

"You also indicated when this was received you would forward check for our old balance on the Infirmary job of $1232.-59."

On February 21, 1933, Cooke wrote the credit man: "In my letter which I enclosed $400.00 which I paid *out of this estimate* left me about $7,000.00 with this money I had to pay my last months bills and still have enough to pay the labor for this month. I thought I was doing great. I figured that I was getting along fine with the bills that Cooke & Maxey owed. I have taken it upon myself to pay them all, and yours happened to be the last one." (Italics supplied.)

When the matter, after January 7, 1933, with Cooke's knowledge, was going through the regular routine to the *proper officer at the Home Office for approval by written acceptance,* and then and there by the credit man within a reasonable time, looking into the credit matter by proper investigation, and ascertaining that Cooke's former partner, Maxey, was dead, and that there remained a claim still due the Steel Company on the Cooke & Maxey Infirmary job at Shawnee, Oklahoma, and that the proceeds from the present job at Tahlequah, this order to be furnished to be paid therefrom, were intended by Cooke to be reduced to liquidate such old indebtedness, and all this being presented to the officer having such authority to approve in writing, such acceptance in writing and approval by him was thereupon refused. That Cooke understood such matters is evidenced by his words: "I explained to Mr. Naylor how things was with me since Maxey's death, and he could see that I was O. K. if given a chance.[9]"

Neither does the record disclose any binding acceptance, acts of Naylor proved to indicate an acceptance not binding the Steel Company on account of the written limitation placed therein as to his authority, all known to Cooke, nor does it disclose an acceptance by any acts, by silence or otherwise, on the part of the Steel Company.

[9] (Letter, February 21, 1933.)

The exigency of the depression brings many matters before us which excite our interest and sympathy, but we are bound by the contract and the law applicable thereto. The Steel Company's request for a directed verdict should have been granted.

The judgment of the lower court is reversed with directions to grant a new trial.

BRATTON, Circuit Judge (dissenting).

In stating briefly the reasons for my inability to concur in the opinion of the majority, reference will be made to the parties as they appeared in the court below. The proposal, called a quotation, expressly provided that prompt acceptance by plaintiff and written approval of defendant at its home office should constitute a binding contract. It may be conceded that Naylor did not have authority to make such a contract for his principal, and that he lacked authority to waive the requirement of such approval. But he was the general agent of defendant in Oklahoma, clothed with authority to solicit business, prepare and present instruments of that kind to contractors and forward them to the home office, and generally to do all things in furtherance of the business. The quotation was prepared and signed in the usual, ordinary, and regular course of business. Naylor retained one copy of it after it was executed on November 23, 1932, and delivered one copy to plaintiff; and he did likewise concerning the modification executed on January 7, 1933. That constituted retention and possession of the defendant; and whether he delayed in forwarding it to the home office did not affect the rights of plaintiff as to the time within which defendant should accept or reject it. Naylor knew at the time the original quotation was signed the circumstances under which plaintiff was to construct the building. He knew that plaintiff was required to complete it within 140 days and was subject to the severe penalty of $70 for each day thereafter until it was completed. He further knew that plaintiff was depending upon defendant to furnish the material, and that he was going forward permitting the 140 day period to be consumed and the time for the imposition of the penalty to draw nearer and nearer without making any effort to secure the steel elsewhere, all in reliance upon defendant. With that knowledge, defendant kept and retained the quotation from its execution, and did not notify plaintiff that it was either accepted or rejected until March 20, 1933, at which time it advised him that it elected to reject. The period thus intervening was 117 days. In other words, with knowledge that plaintiff had only 140 days within which to complete the building; that he would be subject to the penalty after the expiration of that time; and that he was relying upon it to furnish the material necessary to save him from the penalty, defendant waited 117 days and then undertook to exercise the privilege of rejection. Ordinarily an offeree has the right to make no reply to an offer and his silence cannot be construed as an acceptance. But the special circumstances presented here required acceptance or rejection within a reasonable time. Defendant could not wait beyond a reasonable time and then reject. Failure to act within a reasonable time amounted to acceptance. Laredo National Bank v. Gordon, 5 Cir., 61 F.2d 906, certiorari denied, 289 U.S. 726, 53 S.Ct. 524, 77 L.Ed. 1476; Cole-McIntyre-Norfleet Co. v. Holloway, 141 Tenn. 679, 214 S.W. 817, 7 A.L.R. 1683; Sioux Falls Adjustment Co. v. Penn Soo Oil Co., 53 S.D. 77, 220 N.W. 146; Hendrickson v. International Harvester Co., 100 Vt. 161, 135 A. 702; Hobbs v. Massasoit Whip Co., 158 Mass. 194, 33 N.E. 495.

The majority lay stress upon the correspondence between the parties. It was not until late in January that anything appeared in the correspondence which could be construed as touching even indirectly or remotely upon the question of the approval or rejection of the contract. At least 60 days of the allotted time for completion of the building had then elapsed. And from that time until the notice of rejection, plaintiff was warranted in believing from the correspondence that defendant intended to furnish the material but was making use of the situation to compel payment of the old account. The attitude of defendant was well calculated to toll him into that belief. Instead of acting sooner, defendant waited until it had thus secured payment of the account, and then when not to exceed 23 days remained for completion of the building before the penalty provision became operative, it was stated for the first time that approval would be withheld. The correspondence was not enough as a matter of law to relieve defendant of the duty to act within a reasonable time, or to foreclose plaintiff from recovery. The question whether defendant failed to act within a reasonable time was one of fact for the jury. The court submitted it under appropriate in-

structions and the jury resolved it against defendant. There was substantial evidence to support the finding, and it should not be disturbed on appeal.

The verdict was for the full amount alleged in 'the petition and sought in the prayer. No evidence was offered on the trial in support of the alleged items (1) traveling expenses, $65.80; (2) additional material purchased or furnished, $103.37; (3) additional labor caused by delays, $1,-180.58; (4) extra overhead expense at the rate of $150 per month, $290; and (5) extra pay to superintendent at $6 per day, $348. These items aggregate $1,987.75. The verdict cannot stand in respect to them, but there was substantial evidence to support it as to all others.

Generally an appellate court may not direct entry of a judgment for the correct amount, but it may affirm on condition that a remittitur be filed within a fixed time. United States Potash Co. v. McNutt, 10 Cir., 70 F.2d 126; United States v. Utah-Idaho Sugar Co., 10 Cir., 96 F.2d 756. The judgment should be reversed and the cause remanded for a new trial unless a remittitur in the sum of $1,987.75 be filed within a time to be fixed; but if such remittitur is seasonably filed, the judgment, less the amount of the remittitur, should be affirmed.