**BURNS BROS. v. LONG ISLAND R. CO. et al.**

**PALMER et al. v. BURNS BROS. NO. 77.**

**No. 255, Docket 21315.**

United States Court of Appeals
Second Circuit.

Argued June 14, 1949.

Decided Aug. 8, 1949.

John J. McElhinny, New York City, for respondents-appellants Central R. Co. of N. J. and Walter P. Gardner, as trustee.

Burlingham, Veeder, Clark & Hupper, New York City (Chauncey I. Clark, George R. Wagner, New York City, of counsel), for appellant Long Island R. Co.

Hagen & Eidenbach, New York City (Henry C. Eidenbach, New York City, of counsel), for respondent-appellee Erie R. Co.

Alexander & Ash, New York City (Edward Ash, Sidney A. Schwartz, New York City, of counsel), for Burns Bros. appellee.

Before SWAN and CHASE, Circuit Judges, and SMITH, District Judge.

CHASE, Circuit Judge.

The coal boat, Burns Bros. No. 77, lay moored at the foot of 36th Avenue, Long Island City, during the evening of April 1, 1945, until she broke adrift when, so it was alleged, she was hit by a carfloat owned by the Central Railroad of New Jersey. Later that evening she was drifting in a sinking condition in the East Channel north of Rainey Park and was picked up by a tug owned by the New York, New Haven and Hartford Railroad Company and beached at the foot of Broadway Astoria.

Burns Bros., the owner of the coal boat, brought suit in admiralty in personam against the sole surviving trustee of the Central Railroad Company of New Jersey, the Long Island Rail Road Company and the Erie Railroad Company to recover damages sustained by the coal boat which were alleged to have been caused by the negligence of those respondents which caused her to go adrift; and against the trustees of New York, New Haven & Hartford Railroad Company for damages sustained by the coal boat which were alleged to have been caused by the railroad tug's negligence during the salvage operation. Hereinafter we shall disregard the trustees just mentioned and refer only to the railroads as Central, Long Island, New Haven, and Erie. The New Haven sued the coal boat in rem and Burns Bros. in personam to recover salvage. The suits were consolidated for trial and after trial the Erie and New Haven were exonerated, but both the Central and the Long Island were held liable in an interlocutory decree from which they have appealed. Burns Bros. was held liable for salvage in a final decree from which Long Island has appealed. Burns Bros. has filed cross assignments of error in the dismissal of the libel against Erie.

 Much of the trial was devoted to resolving disputed questions of fact, of which one seriously contested was whether the coal boat was actually struck by the Central's carfloat. We shall not, however, indulge in an analysis of the evidence for it is clear that taken as a whole it does give substantial support for the findings which follow in summary and consequently these findings are to be given effect. United States Lighterage Corp. v. Petterson Lighterage & Towing Corp., 2 Cir., 142 F.2d 197.

The Long Island maintained a rack at the foot of 6th Street, Long Island City, north or upstream from which its carfloats and those of other railroads, which paid a nominal fee for this service, were tied up either while waiting to go into float bridges or to be towed away afterwards. On the evening above mentioned several carfloats had been lying moored at this rack and some had been "drilled out," leaving after 8:50 P.M. E.W.T., the following in this order beginning at the rack: the Central No. 35; outside her the Central No. 42; outside her the Long Island No. 20; and outside her the Erie No. 41.[1] The inside float was moored to the rack and each of the others was tied to the next downstream float. While the carfloats which had been "drilled out" were being removed, the Long Island's tug Patchogue had stood by and

---

[1] The evidence would seem to require a finding that B. & O. floats 170 and 177 were also there and were the inside floats, but this is not important.

acted, as was customary, as a "holding up" tug to push the outer floats in and make them fast to those inside. The Patchogue was standing by for this purpose when the last removal of a float with which this appeal is concerned was started, but left before it was finished to go to another rack to do some work. The float then removed was the Erie No. 41, which was hanging outside the others. As was customary in removal of an end float, the Erie tug Rochester went alongside her, made fast there and towed her away, leaving the remaining floats in the same positions they had occupied so that no "pushing in" was needed. The Rochester made this removal carefully but did not inspect the lines of the remaining floats afterwards, nor did any one acting for the Long Island do so.

At about 10:00 P.M., when the tide was on the flood at about one and one-half knots and there was a twenty-seven mile wind from the southwest, the lines between the Central No. 35 and the Central No. 42 parted. The immediate cause of that was not shown. The Central No. 42 and the Long Island No. 20, still made fast to each other, then drifted to 36th Avenue where the libellant's coal barge was moored and the Central No. 42 struck and damaged the stern of the barge and drove her against the cribbing which stove a hole in her bow. The barge was set adrift and drifted until picked up by the New Haven's tug and beached at the foot of Broadway. About the same time the Central No. 42 and the Long Island No. 20, which had broken apart when the coal barge was struck, were picked up by tugs to the north of Hallet's Cove.

There was no floatman on any of the floats moored at the rack and the trial judge held the Central at fault for not having one on its float which broke away. The Long Island was found guilty of negligence which contributed to the injury because the Patchogue left the floats at the rack unattended.

We cannot agree that the Central was under any duty to maintain a floatman on the Central No. 42 while she was at the rack. The float was merely hanging there to be "drilled out" when her turn came and the entire flotilla was protected from drifting in whole or in part so long as the Patchogue stood by. Her situation when so guarded is to be distinguished from that of the barge in United States v. Carroll Towing Co., 2 Cir., 159 F.2d 169, on which living quarters for a bargee were maintained and a bargee was ordinarily present; his absence during a considerable part of his customary working hours was held inexcusable under the circumstances and to be negligence attributable to the barge owner. In contrast, no living quarters are provided on a float and it is not customary to keep a man aboard; there was therefore no reason for the Long Island to rely upon the presence of a floatman in conducting its operations or for the Central to anticipate that the Long Island would conduct its operations in such a manner as to make the presence of a floatman necessary. Cf. New York Central R. Co. v. The Talisman, 288 U.S. 239, 53 S.Ct. 328, 77 L.Ed. 721; The No. C-4, D.C., 300 F. 757, affirmed, 2 Cir., 300 F. 761.

Nor do we think the Central was rightly held liable for other reasons. The libellant had the initial burden of proof to show that the coal barge was damaged because of the negligence of one or more of the respondents. The Clara, 102 U.S. 200, 26 L.Ed. 145. It made out a prima facie case against Central when it established the fact that its moored coal barge was struck and damaged by the moving Central No. 42 because under such circumstances the moving vessel is presumed to be at fault until the presumption is offset by proof that absolves her. The Louisiana, 3 Wall. 164, 70 U.S. 164, 18 L.Ed. 85; The D. L. & W. No. 442, 2 Cir., 30 F.2d 250; The Buffalo, 2 Cir., 56 F.2d 738; The Charles H. Sells, 2 Cir., 89 F.2d 631. See Amoskeag Mfg. Co. v. The John Adams, C.C.D.Mass., 1 Fed.Cas.No.338 (the English precedents reviewed). This is, of course, equally true when, as here, the suit is in personam against the owner of the moving vessel. Lind v. Pennsylvania R. Co., 2 Cir., 139 F. 233; Hamburg American Packet Co. v. Rich, 3 Cir., 159 F. 667.

We have no occasion for discussing now in detail just what must be shown to offset the above-mentioned presumption and discharge the burden of proceeding to meet a prima facie case. See, however, The Anna C. Minch, 2 Cir., 271 F. 192; The P. R. R. No. 216, 2 Cir., 56 F.2d 604; The Louisiana, supra, The Buffalo, supra; and Morgan, Some Observations Concerning Presumptions, 44 Harv. L. Rev. 906, 926-29. Compare The Cullen No. 32, 2 Cir., 62 F.2d 68, 70. The reason that no such general discussion is necessary is that the Central's float was, before it broke away, moored at the rack in the custody of the Long Island; the Long Island, therefore, had become the bailee of the float and was responsible for its care while so moored. New York Central R. Co. v. The Talisman, supra; In re Pennsylvania R. Co., 2 Cir. 48 F.2d 559, 562-563. Cf. Palmer v. Agwilines, 2 Cir., 135 F.2d 689; C. F. Harms Co. v. Erie R. Co., 2 Cir., 167 F.2d 562. It cannot be said that the Central was negligent in permitting its float to be and remain so moored in the custody of the Long Island and the trial court properly acquitted the Central of any "fault in respect of mooring lines" so the Central rebutted the prima facie case of personal negligence by showing that the float drifted while in possession of the bailee.

We need not determine whether the presumption of fault which made out the prima facie case against Central is to be carried over to the bailee for there was affirmative evidence of the latter's negligence. When the Patchogue left, there was no one acting for the Long Island to care for the lines on the floats. We do not hold that it was negligent per se for the Patchogue to leave while the end float was being removed by the Rochester, for that operation would require no movement of the other floats. But the duty to maintain the lines in safe condition was and remained that of the Long Island, and, since it did not otherwise provide for performance of that duty, it was negligent for the Patchogue to leave and thus take the chance that the fasts of the remaining floats would become unsafe as the result of any disturbance when the end float was removed or for any other reason. The Long Island was clearly duty bound as the bailee either to use reasonable care to maintain the fasts on the floats or to maintain a holding up tug to protect them, and after the Patchogue left it did neither.

There was no finding, or evidence to require one, that the Rochester was negligent in removing the end float, and so there was no error in the dismissal of the libel against the Erie. Cf. United States v. Carroll Towing Co., supra. The negligence of the Long Island was therefore the sole proximate cause of the collision with the libellant's coal barge and the decree will be modified to hold that respondent solely liable.

The appeal by Long Island from the final decree in the salvage suit does not attack the amount of the award but only the proportionate allotment of it among the captain and crew and the owner of the New Haven tug. Since Long Island must pay the amount of the award no matter how it may be apportioned among those entitled to share in it, Long Island has no interest in the apportionment and as none of the parties who do have an interest in that raise any question about it the appeal is dismissed.

Appeal from final decree dismissed. Interlocutory decree modified as above.